634 A.2d 201

**Kathryn JONES, Appellee,**

v.

**Joseph TROJAK, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 7, 1992.

Decided Nov. 23, 1993.

Reargument Denied Feb. 28, 1994.

96

Ronald Ervais, Mary Jane Deaves Hopkins, Philadelphia, for appellant.

Paul R. Beckert, Doylestown, for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

## OPINION

NIX, Chief Justice.

Appellant, Joseph Trojak ("Trojak"), appeals from the Order of the Superior Court affirming the Order of the Court of Common Pleas that blood tests had been properly ordered and reversing the determination of paternity. This case presents

two issues for our review. The first is whether an order by a trial judge that parties to a paternity suit submit to a blood test is appealable.[1] The second issue is whether blood tests were properly ordered. Our determination of that depends on whether Appellee, Kathryn Jones ("Jones"), overcame the presumption that her child is the child of her former husband with whom Jones lived at the time of conception and birth.

The factual circumstances of this case are as follows: On January 20, 1988, Jones filed a paternity suit against Trojak, alleging that he was the biological father of Katie Jones ("Katie"), who was born October 30, 1987. At the time of the child's birth, Jones was still married to and living with William Jones. The trial court ordered all of the parties involved to undergo blood tests to determine paternity. Trojak objected, contending that Jones failed to rebut the presumption of her ex-husband's paternity and, therefore, blood tests were unnecessary. The trial court overruled the objection, and the blood tests were administered. The results from the blood tests indicated that William Jones could not be the father and that Trojak shared genetic markers with Katie which gave rise to a 99.9% probability that he is the biological father. On October 26, 1988, the trial court found Trojak to be the biological father of Katie. An appeal was filed, but was discontinued after the trial court granted a new trial.

During the second trial, Trojak raised an objection to the use of the results from the blood tests from the first trial. Trojak argued that the results from the blood tests from the first trial could not be used because the disposition of the first trial was vacated and a new trial was ordered. Record at 16A.

1. The Superior Court stated, "[w]hether the trial court's order ... was appealable is not free from doubt. A motion to quash, however, was denied by a judge of this Court, and that ruling was not reviewed by the full Court. The issue of appealability, moreover, was not again briefed or argued by the parties." *Jones v. Trojak*, 402 Pa.Super. 61, 65–66, 586 A.2d 397, 399 (1990). In order to resolve any doubts and to serve the interest of judicial economy and fairness, the Superior Court considered the issue. *Id.* at 66, 586 A.2d at 399. Neither party raised the issue of appealability to this Court; however, upon examination of the procedural history of this case, we find that in order for this Court to determine the substantive issue raised by the parties, the issue regarding appealability must be determined.

However, on June 19, 1989, the trial court entered an Order that the blood tests taken at the first trial would be considered in determining paternity at the second trial. Trojak filed an interlocutory appeal to the Superior Court, and Jones filed a motion to quash. The motion to quash was denied. Subsequently, on January 11, 1990, while the appeal was pending before the Superior Court, the trial court filed an Opinion and Order finding that Trojak was the child's natural father. The Superior Court reversed the trial court's June 19, 1989 Order and remanded the matter to the trial court. We granted Trojak's request for review.

Prior to reaching the substantive issue raised herein, we will address the procedural question of whether Trojak's appeal of the trial court's June 19, 1989 Order is an appealable order. The question presented is whether a court order requiring blood testing is entitled to interlocutory review. This Court has not determined whether a court order requiring blood testing is appealable, and we find that these circumstances present us with the opportunity to speak on this issue.

Although we have not addressed the issue, the Superior Court recently did so in *Christianson v. Ely,* 390 Pa.Super. 398, 568 A.2d 961 (1990). In arriving at its decision, the Superior Court acknowledged that a matter is not appropriate for appellate review where there has not been a finding as to the issue of paternity. Moreover, an appeal from an order to draw blood from a putative father is generally not appealable. *Id.* at 401, 568 A.2d at 962. However, in *Christianson,* the Court reasoned that, because of the circumstances of that case,[2] the appeal was allowed under the authority of *Myers v.*

---

2. The circumstances in *Christianson* were that the order requiring the parties to submit to blood tests "was inappropriate as the procedure utilized in the court below did not properly present a case which permitted the Order to be issued." Thus the Superior Court reasoned "[t]o quash the appeal and remand without considering the merits of the appeal at this time would be to permit the court to continue in error, to impose a likely invasion of privacy on appellant, to violate due process and to assure that a subsequent appeal would follow." *Christianson,* 390 Pa.Super. at 402, 568 A.2d at 962. Accordingly, the court said that "[f]or the sake of judicial economy, a common sense approach

*Travelers Ins. Co.*, 353 Pa. 523, 46 A.2d 224 (1946).[3] The Superior Court granted the appeal from an order requiring the putative father to submit to a blood test based on this Commonwealth's long-standing doctrine of estoppel.[4] The Superior Court held that, "[w]hen an Order appealed from involves a blood test and the issue presented focuses on whether or not the doctrine of estoppel must be applied to the denial of paternity by a presumptive parent which will control whether or not an Order to submit to blood tests will issue, [we have] treated the Order as appealable." *Christianson*, 390 Pa.Super. at 402, 568 A.2d at 962.

For the purpose of resolving this issue, we find it helpful to look to courts in other jurisdictions for insight. In some jurisdictions, an order for a blood test is interlocutory and, thus, non-appealable,[5] while other courts have held that, al-

requires our resolution of the fundamental issues presented by [this] case." *Id.*

3. The issue in *Myers* was whether, in an action in assumpsit, a plaintiff may be required to submit to a physical examination. Before the proceedings commenced, the defendant petitioned the trial court to stay the proceedings until plaintiff submitted to a physical examination. 353 Pa. at 524, 46 A.2d at 225. The court issued a rule upon plaintiff to show cause why the prayer of the petitioner should not be allowed, and after an answer and hearing, the rule was made absolute. *Id.* Plaintiff appealed and defendant filed a motion to quash the appeal on the premise that it was from an interlocutory order. In *Myers*, this Court referenced Wigmore on Evidence, Vol. VIII, p. 208, which suggested that such an order may be made final and appealable by dismissing the suit if plaintiff persisted in refusing to submit to such a physical examination. Although finding that to be undoubtedly true, this Court found it unnecessary to require the formal dismissal of the action and treated it as an appealable order. *Id.* at 525, 46 A.2d at 225.

4. The doctrine of estoppel relating to paternity suits mandates that neither a presumptive father nor the natural mother may be permitted to deny paternity if the two have lived together as husband and wife and the presumptive father has acted in a manner indicating that he was the child's father. *John M. v. Paula T. and Michael T.*, 524 Pa. 306, 571 A.2d 1380, *cert. denied*, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990).

5. *E.g., Scheland v. Childress*, 313 Ark. 165, 852 S.W.2d 791 (1993); *State v. Marut*, 63 Ohio App.3d 487, 579 N.E.2d 281, *appeal dismissed*, 45 Ohio St.3d 711, 545 N.E.2d 910 (1989); *Heavner v. Heavner*, 73 N.C.App. 331, 326 S.E.2d 78, *review denied*, 313 N.C. 601, 330 S.E.2d 610 (1985).

though interlocutory, it was appealable because of the nature of the order.[6]

We hold that court ordered blood tests to determine paternity are appealable, even though they are interlocutory. Our holding is necessitated by this Court's concern for the best interests of the child. *See In re Change of Name of Zachary Thomas Andrew Grimes to Zachary Thomas Andrew Grimes–Palaia*, 530 Pa. 388, 609 A.2d 158 (1992); *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992). The best interests of the child standard has also inspired decisions in other jurisdictions. In those jurisdictions, the primary concern is that because blood tests, for the purposes of determining paternity, may potentially have a negative impact on the mental, moral and spiritual well-being of the child and the family unit, it is in the best interest of all parties that court ordered blood tests, for the purpose of determining paternity, be appealable. *See, e.g., Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989); *McDaniels v. Carlson*, 108 Wash.2d 299, 738 P.2d 254 (1987).

The Washington Supreme Court in *McDaniels* was confronted with a case that involved a paternity action where the plaintiff claimed that he, and not the presumptive father, was the natural father of the child born to the mother. One of the two issues raised by the parties was, "what role does public policy and the best interests of the child play in the allowance of paternity actions sought under the Uniform Parentage Act. . . ." 108 Wash.2d at 303, 738 P.2d at 257. The Washington Supreme Court acknowledged that:

> [a] paternity suit, by its very nature, threatens the stability of the child's world. . . . It may be true that a child's interests are generally served by accurate, as opposed to inaccurate or stipulated paternity determinations. . . . However, it is possible that in some circumstances a child's interests will be even better served by no paternity determination at all. . . .

---

**6.** *See, e.g., County of Stearns and Kim Marie Olson v. Schaaf,* 472 N.W.2d 191 (Minn.App.1991); *Commonwealth v. Beausoleil,* 397 Mass. 206, 490 N.E.2d 788 (1986).

*Id.* at 310, 738 P.2d at 261. The Washington Supreme Court held that "[t]he mere filing of a paternity action does not automatically imply that the action is in the child's best interest." *Id.* at 313, 738 P.2d at 262. The Washington Supreme Court went on to say "that [a] court must reach this conclusion independently based on the facts in the record. . . ." The Washington Supreme Court held that, upon consideration of the facts of that case, the paternity action would be permitted because it was in the child's best interest to have her biological father identified. *Id.* at 313, 738 P.2d at 262.

Similarly, the Kansas Supreme Court recognized that, because of the potential for irreparable emotional and physical harm, the best interests of the child must be considered prior to ordering blood tests. The Kansas Supreme Court reversed the decision of the Kansas Court of Appeals which held that an evidentiary hearing on the best interests of the child need not preclude a paternity determination. *Marriage of Ross,* 245 Kan. 591, 783 P.2d 331 (1989). The Kansas Supreme Court concluded it was error to fail to weigh the best interests of the child prior to permitting the paternity action to proceed because "[o]nce the judge, in the interest of judicial economy, ruptures the father/child relationship, the judge cannot return the parties to the position they were in prior to the blood tests, no matter how wise or great his or her judicial power." *Id.* at 601, 783 P.2d at 338. The Kansas Supreme Court, in concluding that the lower court erred by failing to weigh the best interests of the child prior to permitting the paternity action to proceed, stated:

> Prior to ordering a blood test to determine whether the presumed parent is the biological parent, the District Court must consider the best interests of the child, including physical, mental, and emotional needs. The shifting of paternity from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of any child.

*Id.* at 602, 783 P.2d at 338. The Court relied on *McDaniels,* and held that, "the mere filing of a paternity action does not

automatically imply that the action is in the child's best interests." *Id.*

We find the decisions of both the Washington and Kansas Supreme Courts instructive. Permitting these types of blood tests to be appealable, notwithstanding their interlocutory nature, provides appellate courts the opportunity to insure that trial courts have properly scrutinized the facts and determined that blood tests would be in the child's best interests. Our concern is that once a party to a paternity action submits to a blood test, the psychological and moral damage will have been done, the family unit will have been intruded upon, and, most importantly, the child will have been scarred from the mental stress and the social stigma associated with having the identity of his or her parents investigated. Restated, this Court's concern is that the potential negative ramifications of a blood test on the child are irreversible.

Although the general rule that interlocutory orders are not appealable is based on concerns related to judicial economy, we find that protecting the emotional and physical well-being of innocent children caught in adult controversies overrides any argument based upon judicial economy. In the present case, Katie's interest must not be overlooked. Katie's mother is claiming that someone other than the man she was married to and living with at the time Katie was conceived is the father. The potential for these types of accusations to have a lasting negative impact on children is too great for this Court to overlook. Accordingly, we find it necessary that, when an appeal is taken, appellate courts in this jurisdiction review court ordered blood tests at the interlocutory stage.

█ Having held that the order requiring blood tests was appealable, we now turn to the substantive issue of this appeal: whether there must be a determination that a child born to a married couple, living together at the time of conception and birth, is not a child of the marriage before a blood test can be ordered on a third party.

Trojak argues that there is a presumption that a child born to a married couple is a child of that marriage and this

presumption remains unless rebutted by evidence from someone other than the parties. Trojak avers that, in the instant case, the presumption that William Jones is the father has not been overcome. To buttress his position, Trojak refers to evidence indicating that Mr. and Mrs. Jones have publicly held themselves out as the parents of Katie, that William Jones took the child to the hospital and signed as the responsible party and gave his consent to the Caesarean delivery. Furthermore, Trojak submits that William Jones' medical insurance paid the cost of hospitalization, that William Jones is listed as the father on both the birth and baptismal certification, and that William Jones has never publicly denied his paternity of the child.

Jones contends that the trial court correctly ordered the blood tests and admitted the results based upon the factual record indicating that there was strong evidence [7] that Trojak was the parent of the child. Also, because the trial court found no intact family [8] considerations were present, Jones avers that the presumption that her former husband is the father of the child has been overcome and, therefore, blood tests were properly ordered.

We adopt the approach taken by the Superior Court in *Christianson v. Ely,* which mandates that before an order for a blood test is appropriate to determine paternity the actual relationship of the presumptive father and natural mother

---

**7.** According to Appellee, this strong evidence was that "(1) [Appellant] admitted plaintiff told him that she was not having sexual relations with her husband at or around the time the child was conceived; (2) Sexual relations for one to two years prior to conception and during the time of conception were admitted by both parties; (3) Appellant made regular weekly payments for approximately two years of amounts of support culminating in payments of $50.00 per week; (4) [Appellant] paid other expenses, such as, school clothes, shoes, tuition and other amounts denominated 'for Katie.'" Appellee's Brief at 18.

**8.** The phrase "intact family" has been used by our lower courts to describe a situation where the presumptive father and natural mother live together as husband and wife and accept the responsibility of parenthood. *See Everett v. Anglemeyer,* 425 Pa.Super. 587, 625 A.2d 1252 (1993); *Coco v. Vandergrift,* 416 Pa.Super. 444, 611 A.2d 299 (1992).

must be determined. 390 Pa.Super. 398, 409, 568 A.2d 961, 966. In *Christianson*, a mother was estopped from challenging the paternity of her husband without exhibiting that he had denied paternity and refused to accept responsibility for the child from the time he was reasonably aware of nonpaternity. *Id.* at 410, 568 A.2d at 966. In *Christianson*, there was a question as to whether estoppel could be invoked to prevent the blood tests which were ordered of the putative father, presumptive father and the natural mother. The Superior Court reasoned that, "[w]here the father has accepted the child and treated him as his own, he may not thereafter, upon separation, reject paternity and demand a blood test to rebut the presumption." *Id.* at 402, 568 A.2d at 963. The Superior Court also concluded that the same must be said regarding the mother. *Id.* "[A mother] cannot hold out her husband to be the father and thereafter, upon separation, charge a different man with paternity." *Id.* Depending upon the court's determination as to the above-mentioned relationship between the presumptive father and natural mother, the doctrine of estoppel may apply. *Id.* at 403, 568 A.2d at 963.

■ A court may order blood tests to determine paternity only when the presumption of paternity has been overcome. *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380, *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). This Court has held that the presumption can be overcome by proof of facts establishing non-access or impotency. *Cairgle v. American Radiator and Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951). However, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child. *John M.*, 524 Pa. at 318, 571 A.2d at 1386. These estoppel cases indicate that where the principle is operative, blood tests may well be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted. *Id.* However, the doctrine of estoppel will

not apply when evidence establishes that the father failed to accept the child as his own by holding it out and/or supporting the child. *Christianson*, 390 Pa.Super. at 409, 568 A.2d at 966. Only when the doctrine of estoppel does not apply will the mother be permitted to proceed with a paternity claim against a putative father with the aid of a blood test. *Id.* Instantly, the trial court found that Jones had presented the requisite clear, direct, convincing and unanswerable evidence to support her claim that her husband had not accepted the child as his own.

 Trojak cites our holding in *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380, *cert. denied*, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990), to buttress his position that the presumption that Katie is a child of the marriage has not been overcome. Trojak fails to comprehend the important distinction between our reasoning in *John M.* and the facts of the instant case. In *John M.*, our rationale grew out of this Commonwealth's concern for the survival of the family unit. This Court believed that "the Superior Court, in ordering the presumptive father to submit to a blood test at the request of the putative father, over-emphasized the rights and interests of the [putative] father and minimized the rights and interest of others involved in and affected by its decision, namely the mother, [presumptive] father, the family unit and the Commonwealth." *John M.*, 524 Pa. at 316, 571 A.2d at 1385. We stated that "[t]here is in short, a family involved here . . . [a] woman and a man who have married and lived together as husband and wife, giving birth to and raising four children." *Id.* at 317, 571 A.2d at 1386.

In this case, however, we agree with the trial court and are convinced that the facts indicate that the presumptive father and mother repudiated their marriage vows long ago. Additionally, we have evidence that the presumptive father did not accept the child as his own. The circumstances before us, as found by the trial court, are that the presumptive father has never financially or emotionally supported Katie. Moreover,

the trial court found that during the time Katie was conceived, Jones was not sexually involved with the presumptive father because he was impotent, and this testimony was not rebutted by either the presumptive father or the putative father. Thus, we agree with the Superior Court that there being no intact family considerations present, a determination regarding Trojak's paternity is necessary to resolve the child support claim made by Jones.

■ We also agree with the Superior Court that only properly admitted results from the blood tests, along with other relevant evidence, may be used to determine paternity. The Superior Court determined that the use of the results from the blood tests from the first trial before the Court of Common Pleas could not be used in the second trial because only a printed report of the results from the blood tests was issued by the laboratory which had performed the tests, and this evidence was not properly authenticated and proved. We agree that the results from the blood tests from the first trial were improperly admitted at the second trial and could not be used to determine paternity at the second trial.

Accordingly, we affirm the Superior Court Order reversing the Court of Common Pleas Order of June 19, 1989, and remanding this case to the Court of Common Pleas for additional proceedings.

PAPADAKOS, J., concurs in the result.