**Stacey M. WIELAND**

v.

**Russell WIELAND,**

v.

**Presley T. Dillon, Jr. Appeal Of: Presley T. Dillon, Jr.**

Superior Court of Pennsylvania.

Submitted March 18, 2008.

Filed May 9, 2008.

Brian D. Aston, Greensburg, for appellant.

Eileen C. Billey, Greensburg, for R. Wieland.

Kathleen N. Kemp, Greensburg, for S. Wieland.

BEFORE: BENDER, BOWES and TAMILIA, JJ.

OPINION BY BENDER, J.:

¶ 1 Presley T. Dillon, Jr., appeals from the July 2, 2007 order that dismissed his petition to intervene in the support action filed by Stacey M. Wieland (Mother) against Russell Wieland, Mother's ex-husband, for the support of Presley Harry Dillon. The July 2, 2007 order also dismissed Russell Wieland's preliminary objections to Mother's support complaint.[1] We affirm.

¶ 2 Based upon the testimony and evidence presented at the hearings on this matter, the trial court set forth the following:

Stacy M. Wieland filed a Complaint for Support against Russell Wieland seeking child support for her son, Presley Harry Dillon, born April 11, 2002. In her complaint she alleges that she and [Russell Wieland] were married July 26, 1996, separated on July 30, 2000, and, ultimately divorced on January 1, 2005.

[Russell Wieland] requested a Trial on the issue of paternity, and the parties agreed to undergo paternity testing. The paternity tests revealed that [Russell Wieland] could not be excluded as the Father; to the contrary, the probability of paternity was demonstrated to be 99.99%. [Russell Wieland] filed "Preliminary Objections" in the nature of a Motion to dismiss the child support case. Thereupon the matter was set for Trial.

Prior to trial, Presley T. Dillon, Jr., filed a Petition to intervene in the support action. He alleged that he himself is the biological and "real" father and requested that an adjudication of paternity be entered against him. The hearing was held April 23, 2007. All parties were represented by counsel. The parties stipulated to the following facts:

1. Russell Wieland is the biological father of the child.

2. The Mother and Presley T. Dillon, Jr., lived together at the time of the birth of the child.

3. Presley T. Dillon, Jr. was present at the birth of the child.

4. Stacey Wieland had filed for divorce from Russell Wieland prior to the birth of the child, and were divorced by decree dated December 23, 2005.

---

1. Russell has not appealed to this Court from the dismissal of his preliminary objections and is not participating in this appeal.

5. That Presley T. Dillon, Jr.'s name was placed on the birth certificate as the father.
6. That the child carries Presley Dillon's surname.
7. That the child's name has appeared on tax returns and health insurance policies of Presley T. Dillon, Jr.
8. Stacey M. Wieland and Presley T. Dillon, Jr., lived together from the child's birth until October 20, 2006. They were never married.

The testimony in this matter reveals that the biological mother and father separated September 17, 2000, but during the year 2001 re-united and separated on several occasions (on three occasions according to Russell and on seven occasions according to Stacey). During this period of time, the Mother began seeing Presley T. Dillon, Jr. They had met in December of 2000 and began living together in March of 2001. Apparently, during the time that the Mother was living with Presley Dillon, she was also in the process of moving "in and out" of Russell's residence.

The Mother became pregnant in July 2001, and, according to Presley Dillon, there was never any doubt that he was the [f]ather. He had been told that by the Mother, and he never suspected otherwise. He attended prenatal and Lamaze classes and went to Ob/Gyn appointments. He states that he cried when he found out that he had had a boy. Mr. Dillon related that he and the Mother had discussed names and decided to name the child Presley Harry Dillon. They quickly called him "LP" or "Little Pres." Mr. Dillon signed an acknowledgement of paternity at the hospital and then went home with Stacey and began to raise the child.

Life between Presley Dillon and the Mother was not uneventful. According to Mr. Dillon they lived together rather happily until the child was four years of age. Mr. Dillon "paid for everything." They then moved to Swede Hill where they continued to be happy, according to Mr. Dillon. He states that he was completely devoted to the child and he described in intimate details issues of taking care of the baby when he was colicky, changing diapers, attending doctors visits, hating to see his child get shots, and then taking the child every where with him—riding quads, walking in the woods, looking for deer, playing guns, playing ball, etc. He says that he called the child LP and the child called him "Dad." He also described plowing snow together, attending birthday and holiday parties, etc., and even buying the child clothes. He provided the child health coverage and held the child out as his own. (At the time of birth the child's medical expenses were covered under the health insurance of Russell Wieland, but later Mr. Dillon assumed these expense[s].) Indeed, at the trial Mr. Dillon presented nearly 40 pictures of the child and himself depicting many of the activities he described.

According to the Mother, Mr. Dillon was chronically drunk and prone to fits of violence, causing her to seek protective orders. By the time the Mother and Mr. Dillon separated (in October 2006) they had been in Court on various occasions and the Mother was refusing to permit Mr. Dillon to have custody of the child. The Mother testified at trial that Mr. Dillon had always been abusive. She stated that she put his name on the birth certificate because Mr. Dillon said he would kill her if she did not. She says that she always felt either Russell Wieland or Presley Dillon could have been the Father. She says that most of the custodial time was spent by Mr.

Dillon on the farm of Harry Dillon, and it was Mr. and Mrs. Harry Dillon who actually provided most of the child care when Presley Dillon had the child. She described Mr. [Presley] Dillon as being frequently drunk, and when drunk, violent. She notes how in May of 2006 she obtained employment and says that Mr. and Mrs. Harry Dillon would care for the child while she worked, but that they, rather than Presley would provide most of the child care.

The Mother states that, now that Presley is out of the house, she and Little Pres are doing fine and she has been able to introduce Little Pres to his half-brothers and they now all get along fine.[2]

Harry Dillon himself also testified. He noted that his wife had recently died. He is Presley T. Dillon's uncle. He is 64 years of age and retired. He states that he had known Stacey Wieland for many years, as she had been Presley Dillon's girlfriend. He says that they were in his company frequently during her pregnancy. He recalled how they would frequently stop at his farm and that everyone was happy. He says that Presley Dillon felt the child was his and that from the child's infancy onward they would come to the farm four or five times a week. He says he and LP were almost like father and son, as they did many things together on the farm. He says that Stacey would often drop the child off, and that LP had his own room at their house. He also noted that the child always referred to Presley Dillon as "Dad" except for the last 3 or 4 months. He was never aware that Russell Wieland was the birth father, and only in the last 3 or 4 months was LP told that he was not the child of Presley

Dillon. Harry Dillon states that he has been extremely upset because the Mother will not answer phone calls or permit him to see the child, despite his long history of caring for the child.

Little Pres was interviewed in chambers. He entered the chambers already crying, saying "I only know the answer to two questions." After he calmed down he interchangeably called Presley Dillon "Presley" and "Dad."

Trial Court Opinion (T.C.O.), 7/2/07, at 1–4.

¶ 3 Following the issuance of the July 2, 2007 order, dismissing both Russell's preliminary objections and Presley's petition to intervene, Presley appealed to this Court and now raises three issues for our review.

I. Whether a person's due process rights are violated when the domestic relations office allows a case to establish child support to proceed between two individuals with out giving notice to a person who had twice previously been sued for child support for the same child and there has never been a finding of paternity in the first two instances [?]

II. Whether the trial court erred by ordering genetic testing without first ruling upon the preliminary objections raising a claim of estoppel by a putative father [?]

III. Whether the trial court erred by denying a claim of estoppell [sic] when a person had held himself out as a father, supported the child, and was referred to as Dad by the child for the first 4½ years [?]

Presley Dillon's brief at 3.

¶ 4 We begin by noting that in support matters, we are guided by the following:

2. In light of the DNA test results, the brothers mentioned by Mother in her testimony and the court in its opinion are actually LP's biological brothers, not his half-brothers.

[A] reviewing court will not disturb an order of the trial court unless there has been an abuse of discretion. An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough that we, if sitting as a trial court, may have made a different finding.

*Doran v. Doran*, 820 A.2d 1279, 1282 (Pa.Super.2003) (citations and quotation marks omitted).

 ¶ 5 Presley first argues that "his due process rights were violated when the Domestic Relations Office allowed [Mother] to name [Russell] as the father of a child when [Mother] had twice previously sued [Presley Dillon] for child support." Presley Dillon's brief at 9.[3] Essentially, Presley Dillon contends that the domestic relations office should have been aware that Mother had sought child support for the same child from him and, therefore, should have provided him notice and the opportunity to be heard in Mother's case against Russell Wieland. Presley cites *McKinney v. Carolus*, 430 Pa.Super. 450, 634 A.2d 1144, 1146 (1993), for the proposition that "[d]ue process requires that a party who will be adversely affected by a court order must receive notice and a right to be heard in an appropriate hearing." Despite Presley's allegation against the domestic relations office, he does not explain how that office should or would have known that he had any interest or reason to be involved in the matter between Mother and Russell until Russell filed his preliminary objections on February 2, 2007, in which Russell revealed Presley's involvement.

¶ 6 The certified record reveals that Mother filed an application for child support for LP against Russell on October 23, 2006, indicating that paternity had not been established. On that same date, a complaint was filed and an order was issued setting a date for a conference before a domestic relations officer. That conference was continued because Russell refused to acknowledge paternity. Thereafter, Mother and Russell entered into a stipulation whereby they agreed to submit to genetic testing. The results of the testing indicated that the probability of paternity was 99.99% that Russell Wieland was LP's father, and a court order, issued on November 28, 2006, memorialized the fact that Russell was LP's biological father. A new support conference date was scheduled; however, Russell filed preliminary objections on February 2, 2007, asserting that Mother should have filed for support for LP against Presley, "who has been a father to the child since its birth." Russell's Preliminary Objections, ¶ 5b. Next, on March 28, 2007, Presley filed a petition to intervene in the support action. The hearing on Presley's petition to intervene and Russell's preliminary objections was held on April 23, 2007, and further testimony was heard on May 2, 2007, resulting in the order at issue in the instant appeal.

¶ 7 We agree that Presley was entitled to due process, *i.e.*, notice and an opportunity to be heard. However, he was granted that due process when the trial court allowed him to participate in the April 23rd and May 2nd hearings. The trial court explained its position regarding this argument in a supplementary opinion, stating:

> record supports this allegation and we are, therefore, unable to make the assumption that these filings in fact occurred.

---

**3.** Presley indicates that these two prior actions by Mother were withdrawn without any finding of paternity. Nothing in the certified

The Intervener contends that the Domestic Relations Office's failure to notify him that the mother had filed a support action against her ex-husband and was requesting DNA testing to determine paternity violated his substantive and procedural due process rights as he was the named father of the child on the birth certificate and had a right to object to the order for paternity testing. Although the Intervener was not a party to the support hearing, he was granted intervention by this court to participate in the de novo hearing on the issue of paternity. The Intervener testified at length in support of his contention that the results of the DNA test should be disregarded and that he should be determined to be the child's father pursuant to the doctrine of paternity by estoppel. The fact that the DNA testing took place in no way violates the Intervener's due process rights. The court could have refused to consider the results of the DNA test had the Intervener's argument in favor of his paternity warranted merit. However, application of Pennsylvania case law to the facts of the case militated in favor of accepting the paternity test results and determining paternity in the presumptive (biological) father. (An in depth discussion of the applicable case law is set forth in this Court's Memorandum in support of the July 2nd order.)

Supplemental Trial Court Opinion (S.O.), 10/17/07, at 1–2.

¶ 8 Although the record does not reveal exactly how Presley came to know that Mother's support petition had been filed against Russell, it is evident that Presley was afforded his due process rights in that he was permitted to participate in the hearing before the trial court. He was represented by counsel, presented witnesses and cross-examined witnesses presented by Mother and Russell. However, Presley alleges that an earlier intervention could have prevented the genetic testing and "prevent[ed] [his and Mother's] intact parental relationship from being questioned." Presley's brief at 10. Although Presley does not cite any case law in support of this argument, we are aware that *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201, 203–05 (1993), provides that a court ordered blood test to determine paternity is appealable, even though the order is interlocutory. Therefore, with notice, Presley possibly would have attempted to intervene earlier to try to prevent the testing in the first place. Unfortunately, the test has been performed with Mother's and Russell's agreement and what would have happened if Presley had intervened prior to the testing is speculative at best. We are also puzzled as to what relief this Court could grant at this point in time merely on the basis of a conclusion that Presley's due process rights were violated. Therefore, no relief can be granted on Presley's first issue.

¶ 9 Because Presley's second and third issues concern the doctrine of paternity by estoppel, we review the applicable law related to that doctrine. Initially, we recognize that despite the fact that LP was conceived and born while Mother and Russell were married to each other,[4] the rebuttable presumption of paternity is not applicable since Mother and Russell no longer had an intact marriage to be preserved. *J.C. v. J.S.*, 826 A.2d 1, 5–6 (Pa.Super.2003). Consequently, we must next address whether the doctrine of paternity by estoppel applies.

---

4. Mother filed a complaint in divorce a few months prior to LP's birth, but the divorce was not final until December 23, 2005.

Estoppel in paternity actions is merely the legal determination that because of a person's conduct (*e.g.*, holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father. As the Superior Court has observed, the doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding paternity of the child."

*Warfield v. Warfield,* 815 A.2d 1073, [1076] (Pa.Super.2003) (quoting *Fish v. Behers,* 559 Pa. 523, 741 A.2d 721, 723 (Pa.1999)). Moreover,

Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

*Hamilton v. Hamilton,* 795 A.2d 403, 405 (Pa.Super.2002) (quoting *Fish,* 741 A.2d at 724).

*J.C.,* 826 A.2d at 6.

¶ 10 Specifically, Presley argues that the ordering of genetic testing before ruling on the estoppel claim raised by Russell was error, because it "caused the child harm by calling into question the only father [the child] has known." Presley's brief at 13. Presley recognizes that he is advancing an uncommon position with regard to the paternity by estoppel doctrine in that usually a party would be arguing that someone else is the child's father even after the child has been held out as his own. The implication here is that Mother should be estopped from seeking to have Russell, her ex-husband, named as LP's legal father. Citing *Bahl v. Lambert Farms, Inc.,* 572 Pa. 675, 819 A.2d 534, 539 (2003), Presley points out that the paternity by estoppel doctrine is designed to protect the best interests of the children and allow them "to be secure in knowing who their parents are," and that "[w]here estoppel is operative, 'blood tests may be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted.'" Presley's brief at 12 (quoting *T.L.F. v. D.W.T.,* 796 A.2d 358, 363 (Pa.Super.2002)).

¶ 11 Then, citing *Moyer v. Gresh,* 904 A.2d 958 (Pa.Super.2006), Presley points out that adoption cases have also applied equitable estoppel to adoption cases, notably *In re Adoption of S.A.J.,* 575 Pa. 624, 838 A.2d 616 (2003), and *In re M.J.S.,* 206 Pa.Super. 154, 903 A.2d 1 (2006), *appeal denied,* 590 Pa. 660, 911 A.2d 936 (Pa. 2006), and that both of these cases stand for the proposition that a putative father can be estopped from asserting paternity where he was voluntarily absent from the child's life and assumed no responsibility for the child until years later. Presley then quotes this Court's statement in *M.J.S.,* that "[w]e cannot allow this child's life to be disrupted when [the putative father's] own failure to act resulted in the present situation." *Id.* at 11.

¶ 12 In discussing the doctrine of paternity by estoppel and the policy behind the doctrine, the *Bahl* court stated that "it is designed to protect the best interests of minor children" and that "if certain persons [have] acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told

that the father he has known all his life is not in fact his father." *Bahl*, 819 A.2d at 539. The *Bahl* court then listed cases consistent with the above-stated policy that involve the application of the doctrine to matters dealing with the support of minor children.

See *Fish*, 559 Pa. 523, 741 A.2d 721 (mother seeking child support from lover is estopped from denying paternity of former husband, whom child continues to believe is his father); *Brinkley [v. King]*, 549 Pa. 241, 701 A.2d 176 (man from whom mother seeks child support may present evidence to establish that mother is estopped from denying paternity of former husband); *Freedman v. McCandless*, 539 Pa. 584, 654 A.2d 529, 533 (Pa.1995) ("In any child support matter in which paternity is denied on the grounds of estoppel, the trial court must conduct a hearing on the issue of estoppel and determine whether the mother is estopped from pursuing her claim against the alleged father."); *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (Pa.1994) (mother seeking support from lover is not estopped from denying former husband's paternity when former husband never financially or emotionally supported child).

*Bahl*, 819 A.2d at 539–40.

¶ 13 It is evident that none of these cases fits the fact pattern that confronts us in the present matter, and they do not answer the question as to what occurs after the genetic tests were performed and the child is told the results. It is obvious that the DNA test was requested by Russell in his apparent belief that it would prove that Presley was LP's father. That did not turn out to be the case. Moreover, the harm to the child discussed in *Bahl* has already occurred, a fact that Presley acknowledges. However, Presley contends that continuing harm is occurring through Mother's actions as she attempts to sever entirely LP's relationship with Presley, who was the only father that LP has known, *i.e.*, Presley asserts that for 4½ years he held himself out as LP's father, lived with and supported him, claimed him on his tax returns and provided medical insurance, while Russell had no contact with LP at all. Whether an ongoing relationship between LP and Presley will occur in the future is not at the heart of this matter—that is a custody question. Here, the issue is one of support. Because evidence has proven that Russell is LP's biological father, but, most important, because LP has been informed of this fact, this Court must bear in mind that the best interests of the child is the overriding policy. In fact, public policy favors DNA testing:

DNA paternity testing, with its pinpoint accuracy, has posed more squarely than ever before a dilemma in paternity testing. Before the advent of DNA testing, the determination of paternity could not be as accurately established as it can today. Because the truth can be so reliably revealed, the policy question as to whether to expose the truth or whether to bypass the truth for some important family or societal reasons has taken on added meaning. While we recognize that the right to paternity testing is not absolute and there may be strong family or societal reasons to deny paternity testing, such testing should be favored.... The establishment of a parent-child relationship is important to both parent and child. A father and his child have the right to establish a kinship relationship and the child has a right to expect both financial and emotional support from his or her father. Furthermore, a child's biological history may be essential to his or her future health, and the child's cultural history

may be important to his or her personal well being.

*Conroy v. Rosenwald,* 940 A.2d 409, 416–17 (Pa.Super.2007) (quoting *Strayer v. Ryan,* 725 A.2d 785, 788 (Pa.Super.1999)). Accordingly, we believe that we are compelled to affirm the trial court's decision. However, by issuing an order affirming the trial court's decision in this support matter, we are not suggesting any result as to any custody or visitation litigation that is or may be instituted.

¶ 14 Order affirmed.

¶ 15 Judge Tamilia concurs in the result.