Kelly N. GEBLER

v.

Gregory J. GATTI and Ray Sisson.

**Appeal of Gregory J. Gatti**

Superior Court of Pennsylvania.

Submitted Aug. 29, 2005.
Filed Feb. 2, 2006.
Reargument Denied April 11, 2006.

James G. Moore, Erie, for appellant.

Peter W. Bailey, Erie, for Gebler, appellee.

Frank L. Kroto, Jr., Erie, for Sission, appellee.

BEFORE: KLEIN, McCAFFERY and TAMILIA, JJ.

OPINION BY KLEIN, J.:

¶ 1 Gregory J. Gatti appeals from the order entered in the Court of Common Pleas of Erie County determining that under the doctrine of paternity by estoppel, Gatti is estopped from denying paternity and therefore he is the legal father of B.J.G., born May 25, 2001. Because we find the trial court erred in concluding that the record was devoid of evidence of misrepresentation, we reverse.[1]

■ ¶ 2 Gatti, who was never married to Kelly N. Gebler (Mother), held the child out as his own under Mother's misrepresentation that he was the only one having sexual relations with Mother at the time of conception. He ceased acting as the child's father when he learned that he was not the biological father. The child was eighteen months old at that time. Since the doctrine of paternity by estoppel is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct," it cannot be applied under these facts. *Fish v. Behers*, 559 Pa. 523, 741 A.2d 721, 723 (1999), *quoting Freedman v. McCandless*, 539 Pa. 584, 654 A.2d 529, 532–33 (1995). To do so would defy principles of equity, punishing the party that sought to do the right thing and rewarding the party that has perpetrated a fraud. *See Kohler v.*

*Bleem*, 439 Pa.Super. 385, 654 A.2d 569, 575–576 (1995). A full discussion follows.

Facts

¶ 3 Mother and Gatti were involved in a seven-year relationship; they never married. Toward the end of the relationship, Mother learned she was pregnant. Gatti believed that he was the father and so he helped Mother prepare for the birth, attended the birth, and had his name put on the child's birth certificate. Unbeknownst to Gatti, but certainly known to Mother, Mother had had a sexual relationship with another man around the time she conceived B.J.G.

¶ 4 By the time the child was nine months old, Gatti and Mother ended their relationship. Mother filed an action against Gatti for support. Still under the belief that he and Mother had had an exclusive relationship, Gatti entered into a stipulated support order and attended a custody conciliation conference. Gatti paid support and exercised his custody rights until February 2003, when the child was eighteen months old.

¶ 5 Thereafter, Gatti noticed that the child did not seem to resemble him and had a private DNA test performed, which excluded him as the father. In September 2004, he filed a motion to allow a second DNA paternity test, as the first would not be accepted by the court. The court ordered that: (1) putative father Ray Sisson be added as a party; (2) all parties and the child submit to DNA testing; and (3) DNA test results would not be dispositive of the issue of child support.

¶ 6 The DNA test results excluded Gatti as the biological father. Thereafter, the

---

1. We note that no appeal was taken from the support order. Ordinarily, this would render the matter res judicata and determine paternity as a matter of law. *See Manze v. Manze,* 362 Pa.Super. 153, 523 A.2d 821 (1987). However, for reasons stated *infra,* neither res judicata nor paternity by estoppel is applicable here. *See Moody v. Moody,* 822 A.2d 39 (Pa.Super.2003).

court held a hearing and argument. At the conclusion of the hearing, the court determined that the principle of paternity by estoppel applied and that, as a result of his actions and his failure to raise or show fraud or misrepresentation, Gatti was estopped from denying paternity. We disagree.

Discussion

## A. Presumption of Paternity and Paternity by Estoppel

■ ¶ 7 If a child is born out of wedlock, the presumption of paternity does not apply because there is no intact family to protect. *Brinkley v. King*, 549 Pa. 241, 701 A.2d 176 (1997). If the presumption does not apply, the putative father is entitled to a hearing on the issue of estoppel. *Brinkley, supra; B.S. v. T.M.*, 782 A.2d 1031 (Pa.Super.2001); *Barnard v. Anderson*, 767 A.2d 592 (Pa.Super.2001).

■ ¶ 8 The doctrine of paternity by estoppel is codified at 23 Pa.C.S. § 5102, where one of the statutory means of establishing paternity is holding out the child as one's own and providing support.[2]

## B. Proof of fraud or misrepresentation precludes application of paternity by estoppel

■ ¶ 9 Where, as here, there is no intact family unit to protect, the presumption of paternity does not apply. Whether the estoppel doctrine applies depends upon the particular facts of the case. Estoppel in paternity actions is based on the public policy that children should be secure in knowing who their parents are; if a person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father. *T.L.F. v. D.W.T.*, 796 A.2d 358 (Pa.Super.2002).

¶ 10 Here, the trial court determined that Gatti held himself out as the father for the first eighteen months of the child's life, acknowledged paternity of the child at birth, entered into a support order and exercised his custody rights. The court concluded, therefore, that under these facts estoppel was applicable and Gatti was estopped from denying paternity. *See Fish v. Behers*, 559 Pa. 523, 741 A.2d 721 (1999); *Zadori v. Zadori*, 443 Pa.Super. 192, 661 A.2d 370 (1995). Under that doctrine, the court stated, Gatti was precluded "from challenging the status that he previously accepted." (Trial Court Opinion, 1/12/05 at 4).

¶ 11 This is an accurate, though incomplete, statement of the law. The court disregards the fact that Gatti was operating under the belief that he in fact was the father, because Mother never indicated to him that it was possible that another man could be the father. That he embraced that status for a relatively short period of time solely because he was misled is a critical factor the trial court overlooks.

¶ 12 In its supplemental opinion, the trial court acknowledged that evidence of fraud is relevant to the estoppel analysis

**2.** Determination of paternity.—For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:

(1) If the parents of a child born out of wedlock have married each other.

(2) If, during the lifetime of the child, it is determined by clear and convincing evidence that the father openly holds out the child to be his and either receives the child into his home or provides support for the child.

(3) If there is clear and convincing evidence that the man was the father of the child, which may include a prior court determination of paternity.

23 Pa.C.S. § 5102(b).

and that "a putative father will not be estopped from denying paternity when fraudulent conduct induces that putative father into treating the child as his own." (Supplemental Opinion, 3/15/05 at 1, *citing J.C. v. J.S.*, 826 A.2d 1 (Pa.Super.2003); *Doran v. Doran*, 820 A.2d 1279 (Pa.Super.2003)). The court concluded, however, that Gatti presented no evidence that Mother misrepresented the fact that Gatti was the father and that he raises the issue for the first time in his Pa.R.A.P. 1925(b) Statement of Matters Complained of on Appeal. We disagree. This analysis ignores both the evidence of record and the realities of the circumstances here.

¶ 13 Clearly, Mother is holding all the cards here; only she knew that another man might be the biological father and only she could inform Gatti. The mother is the only one who knows who the possible fathers are, at least until a paternity test is done. Mother's failure to provide Gatti with the information that only she knew, and which she knew if she divulged would provide Gatti with a clear understanding of the matter, lulled him into believing he was the father. Mother concealed that which should have been disclosed, and Gatti acted accordingly. The trial court noted that Mother might have thought the child was most likely Gatti's rather than the other man she was having relations with. However, she was the one that knew she was having relations with someone else and never revealed it to Gatti. This constitutes fraud or at least misrepresentation, and it is undisputed in the record:

> Q: Did she say to you that you were the father?
>
> A: Yes, she did.

Q: Based upon that information what did you do?

A: I took the role as a responsible father, and I cared for the child, thinking that it was mine. I was the only one she had relations with.

\* \* \* \*

Q: ...[Y]ou acknowledged paternity when the child was born. We just covered that, you did that, right? You acknowledged the child was yours?

A: Through what she was saying to me I believed so.

(N.T., 1/11/05 at p. 12, 21). *See B.O. v. C.O.*, 404 Pa.Super. 127, 590 A.2d 313, 315 (1991) ("When an allegation of fraud is injected in a case, the whole tone and tenor of the matter changes. It opens the door to overturning settled issues and policies of the law.").[3]

¶ 14 This case is distinguishable from *Zadori v. Zadori*, 443 Pa.Super. 192, 661 A.2d 370 (1995), where this Court held appellant was estopped from denying paternity. There, appellant knew the child was not his on the date the child was born, and in fact acknowledged that the full term child was born only three months after the parties began sexual relations. *Id.* at 195, 661 A.2d 370. Despite knowing this, appellant agreed to amend the child's birth certificate to list himself as the birth father and thereafter the parties along with the child lived together as a family for almost three years after the child's birth. *Id.*

¶ 15 Here, by contrast, Gatti was essentially in the dark during the relevant time period and, once he learned the truth, he

---

**3.** The test for fraud is: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will thereby by induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. *B.O. v. C.O.*, 590 A.2d at 315.

disengaged. He cannot, under these facts, be held to those actions.

¶ 16 We note also that even where the father and child relationship has been established, unlike the case here, evidence of fraud or misrepresentation may preclude application of the doctrine. *See Doran, supra* (following the DNA test that excluded the appellant as the father of the 11–year–old child, the appellant no longer held the child out as his own; this Court held estoppel did not apply); *see also Moody, supra* (where appellant was misled at the time he signed the agreed order of support, this Court refused to apply paternity by estoppel or res judicata); *cf. V.R., et al. v. G.W.,* 809 A.2d 977 (Pa.Super.2002) (acknowledgement of paternity must be rescinded within two years of discovering fraud).

¶ 17 Thus, the considerations underlying the public policy that drives application of the doctrine are not present here: there is no discernible relationship between the child and Gatti; Gatti discontinued acting as father when he learned that he was not the biological father; and the child is not left unprotected since putative father Ray Sisson has been added as a party and blood tests have determined him to be the biological father. Further, the strong public policy against permitting a party who has acted in reliance upon a misrepresentation to suffer harm as a result precludes application of estoppel here. Whoever mother guessed as the probable father, she knew it was not certain that the father was Gatti. Before assuming responsibility for a child that might not be his, he needs to know that. It is clear from our review of the record that Mother's concealment was intended to deceive Gatti. *See B.O., supra; cf. Hamilton v. Hamilton,* 795 A.2d 403 (Pa.Super.2002) (rejecting fraud argument where no evidence of record was cited to support conclusion that mother fraudulently caused appellant to acknowledge paternity).

Conclusion

¶ 18 The trial court erred in applying the doctrine of paternity by estoppel. There is no intact family to protect; there is no discernible level of a relationship between the child and Gatti; Gatti discontinued holding himself out as father once he learned he was not the biological father; and Gatti's behavior as a responsible father for eighteen months was caused by Mother's concealment of the truth. Under the facts of this case, application of the paternity by estoppel doctrine is precluded.

¶ 19 Reversed. Case remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

¶ 20 TAMILIA, J., files a Dissenting Opinion.

DISSENTING OPINION BY TAMILIA, J.:

¶ 1 In the matter before us Gregory Gatti appeals the decision of the trial court which finds him to be the legal father of B.G. pursuant to the doctrine of equitable estoppel. The majority reverses the trial court and finds the doctrine does not apply as the mother, Kelly N. Gebler, fraudulently induced appellant to undertake the responsibility for parenting the child, thus establishing paternity by estoppel. Upon my careful review of the transcript of the reproduced record, appellant's 1925(a) statement, the briefs of the parties and the trial court Opinion and supplemental Opinion, I believe the trial court was correct in its findings and that the majority Opinion is in error. I, therefore, respectfully dissent.

¶ 2 The statement of facts in the majority Opinion is not in conformity with the findings of facts in the trial court Opinion

and those in the reproduced record. The majority goes astray in stating a finding that "father" "held the child out as his own under the mother's misrepresentation that he was the only one having sexual relations with mother at time of conception" (majority Opinion p. 2). As the trial court detailed in its Opinion,

> Kelly N. Gebler (hereinafter "Mother") and Mr. Gatti engaged in a seven-year relationship with each other, however, they never married and never lived together. Near the end of their relationship, mother learned that she was pregnant with the child and she believed that Mr. Gatti was the child's father. Within one month of discovering that she was pregnant, mother informed Mr. Gatti of the pregnancy and that he was the child's father. As Mr. Gatti testified, he believed that he was the child's biological father and, thereafter, assumed the role of a responsible father.

Trial Court Opinion, Kelly, J., 1/12/05, at 1.

¶ 3 In the supplemental Opinion, the trial court continued to address the fraud allegation (which was untimely), stating "Mr. Gatti avers that this Court erred in its application of the paternity by estoppel doctrine because, pursuant to her allegations, mother induced him into believing that he was the child's biological father and, therefore, he is not estopped from denying paternity of the child because he ceased to have contact with the child once the fraud was revealed." Supplemental Trial Court Opinion, Kelly J., 3/15/05, at 1. The trial court, *citing J.C. v. J.S.*, 826 A.2d 1 (Pa.Super.2003) and *Doran v. Doran*, 820 A.2d 1279 (Pa.Super.2003), acknowledges that evidence of fraud is relevant to the court's equitable estoppel analysis. Supplemental Opinion at 1. Further, the court specifically ruled out fraud in the following statement:

> However, there were neither allegations of mother's fraudulent activity nor evidence of fraud or misrepresentation in this case. Specifically, Mr. Gatti failed to present any evidence to indicate that mother made any misrepresentation or a fraudulent utterance inducing Mr. Gatti to act as the child's father. To the contrary, the credible testimony of mother reveals that she, like Mr. Gatti, believed that Mr. Gatti was the child's father. Moreover, mother's testimony at the Support De Novo Hearing that she 'would also like to have a DNA test done so I do know,' further indicates that she was unaware that Mr. Gatti was not the child's biological father.

*See* Supplemental Opinion at 2, citing, Transcript of Proceedings De Novo, 8/12/04, at 3.

¶ 4 The trial court further points out, "[n]evertheless, for the first time, Mr. Gatti in his Statement of Matters Complained of on Appeal, pursuant to Pa.R.A.P. 1925(b), raised an issue of fraud or misrepresentation by mother." Supplemental Opinion at 1. Matters first alleged in the 1925(b) statement on appeal are not part of the record and may not be considered by the appellate court.[4] The majority has developed its theory of the case in reverse fashion by pursuing the blood test and DNA as proof of non-paternity *before* establishing by clear and convincing evidence that paternity by estoppel was procured fraudulently. The trial judge is the arbiter of credibility of the witnesses and weight of the evidence and on all counts she has concluded that paternity of the

---

4. Pennsylvania Rule of Appellate Procedure 302, *Requisite for Reviewable Issue*, provides:

    (a) General rule.—

> Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.

child was established pursuant to the doctrine of equitable estoppel.[5]

¶ 5 The facts of this case are accurately described in the trial court Opinion.

Kelly N. Gebler (hereinafter "Mother") and Mr. Gatti engaged in a seven-year relationship with each other, however, they never married and never lived together. Near the end of their relationship, mother learned that she was pregnant with the child and she believed that Mr. Gatti was the child's father. Within one month of discovering that she was pregnant, mother informed Mr. Gatti of the pregnancy and that he was the child's father. As Mr. Gatti testified, he believed that he was the child's biological father and, thereafter, assumed the role of a responsible father.

Specifically, in anticipation of the child's arrival, Mr. Gatti and mother made plans together and Mr. Gatti attended pre-natal physician's visits with mother. With regard to the child's birth, Mr. [Gatti] was present for the birth and he stayed with mother at the hospital. Moreover, at the hospital, Mr. Gatti signed an acknowledgement of paternity and the child was given his last name on her birth certificate.

Upon mother and child's release from the hospital, Mr. Gatti stayed with mother and the child for approximately one month to assist with the child's care. Thereafter, Mr. Gatti visited with the child and purchased items for the child's care, including formula, clothes and toys. In addition, Mr. Gatti's relatives provided clothes and baby items for the child, including items received from a baby shower held by Mr. Gatti's mother. Mr. Gatti even claimed the child as a dependent for income tax purposes.

By the time that the child was nine (9) months old, the parties had ended their relationship. Accordingly, mother filed for support of the child. Thereafter, the parties agreed to an amount of child support, a support Order was issued and Mr. Gatti paid support. In addition, the parties attended a Custody Conciliation Conference that resulted in an Order establishing periods of custody for both mother and Mr. Gatti. Pursuant to the court orders, Mr. Gatti continued to pay support and to exercise his custody rights with the child until February of 2003.

The last time that Mr. Gatti saw the child was in February of 2003, when he received the results of a private DNA test, indicating that he was not the child's father. Father initiated the DNA testing based upon his own suspicions that he was not the child's father. Specifically, father testified that the child did not resemble him.

In September of 2004, Mr. Gatti presented to this Court a Motion Requesting the Court Allow a Second Paternity/DNA Test. By Order, dated September 13, 2004, this Court ordered: (1) the addition of the alleged biological father, Ray Sisson, as a party to the action; (2) DNA testing of all parties and the child; and (3) that the DNA results would not be dispositive of the issues pertaining to child support.

The Genetic Test Results, dated November 3, 2004, excluded Mr. Gatti as the child's biological father. Thereafter, on November 30, 2004, Mr. Gatti ob-

---

5. "An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice." See *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403 (2003) (citations omitted).

tained a Rule to Show Cause on the Motion for Hearing presently before this Court. This Court heard testimony and arguments on this matter on January 11, 2005.

Trial Court Opinion at 1–3.

¶ 6 The standard of review is set forth in the case of *J.C., supra.*

Initially, we note that "[o]ur general standard of appellate review in child support matters is an abuse of discretion standard." *Bowser v. Blom,* 569 Pa. 609, 807 A.2d 830, 834 (2002). Moreover, an abuse of discretion is "[n]ot merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record," then discretion has been abused. *Id.*

*Id.* at 3.

¶ 7 As this case turns on the principle of equitable estoppel, as to challenging paternity, the trial court relied on the principle announced in our Supreme Court's decision in *Fish v. Behers,* 559 Pa. 523, 741 A.2d 721 (1999). There, Justice Castille wrote:

¶ 8 In *Freedman v. McCandless,* 539 Pa. 584, 591–92, 654 A.2d 529 (1995), we stated:

Estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in its conduct be permitted to sue a third party for support, claiming that the third party is the true father. As the Superior Court has observed, the doctrine of es-

toppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child."

*Id.,* at 532–33.

In *Jones v. Trojak,* 535 Pa. 95, 105–06, 634 A.2d 201, 206 (1993), this Court discussed the issue of estoppel where the mother of a child sought support from a third party, not her husband, whom she claimed was the father of the child:

[U]nder certain circumstances, a person might be. estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child. *John M. [v. Paula T.],* 524 Pa. at 318, 571 A.2d at 1386. *These estoppel cases indicate that where the principle is operative, blood tests may be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted. Id. However, the doctrine of estoppel will not apply when evidence establishes that the father failed to accept the child as his own by holding it out and/or supporting the child.*

*Fish, supra* at 723 (emphasis added).

¶ 9 The underlying support for this doctrine is expounded in *Ruth F. v. Robert B.,* 456 Pa.Super. 398, 690 A.2d 1171 (1997):

Children; legitimacy; determination of paternity

(a) Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, That all children shall be legitimate irrespective of the marital status of their parents and in any and every case where the children are born out of wedlock they shall enjoy all the rights

and privileges as if they had been born during the wedlock of such parents, except as otherwise provided in Title 20 Pa.C.S.

(b) For purposes of prescribing benefits to children born out of wedlock by, from and through the father, paternity shall be determined by any one of the following ways:

(1) If the parents of a child born out of wedlock shall have married each other.

(2) *If during the lifetime of the child, the father openly holds out the child to be his and receives the child into his home, or openly holds the child out to be his and provides support for the child which shall be determined by clear and convincing evidence.*

(3) *If there is clear and convincing evidence that the man was the father of the child which may include a prior court determination of paternity.*
John M., *supra* at 318–319, 571 A.2d at 1386–1387 (emphasis in original). The highlighted portions of the above statute clearly apply to the facts of this case. *Id.* at 1173.

¶ 10 As clearly spelled out in Judge Kelly's Opinions, the evidence, testimony and law established by clear and convincing evidence that sections (2) and (3) were complied with to establish Gatti's paternity by estoppel of B.G. As pointed out earlier, Gatti did not establish by clear and convincing evidence during the various legal proceedings that mother fraudulently induced him to acknowledge the child's paternity in writing, nor to enter an agreed support and partial custody Order, nor did he proceed as required to take an appeal from the various support/partial custody Orders within sixty days of their entry. The majority would adopt various minority views which have been rejected over several years and in several minority Opinions to rebut the presumption of paternity arising out of marriage and/or equitable estoppel outside of marriage by reliance on blood tests or DNA testing *before* the presumption of legitimacy by marriage or by estoppel has been overcome by clear and convincing evidence.

¶ 11 From the transcript, particularly as testimony was developed on cross-examination, it appears Gatti had no serious doubts about his paternity of the child for almost two years until he was required to pay an increased amount of support and he heard people talking about the child's lack of resemblance to him. The transcript at that point develops this creation of doubt and its various sources as follows:

Q. Was that—at that particular time was the amount agreed to between the two of you?

A. To the courts, no, it was not agreed. Prior to we had—I had went—we had went, as being "we" I should say—to set an agreement so we wouldn't have to go through the court system, then again acknowledging that I thought I was the child's father.

Q. Did she later file for like a modification of the amount or something?

A. Yes.

Q. And what was the outcome of that particular action?

A. She had got more money.

Q. Now when did you start to think you were not the father?

A. About a year to about a year and a half I started seeing and hearing other people talk and the resemblance, and just the qualities of the child just was not there of what our family is. [sic]

Q. Did the child look like you?

A. I believe at first, but they run strong in her bloodline that the father of the children look like Geblers.

Q. What did your doubts lead you to do?

A. I had—*me and my fiancée had talked about it that if we would just get it done privately, no one needs to know just for our well being because of the way the court system was, and the way—the support that I was paying, the large amounts, that it would be worth my while just to get this done and, you know, just for peace of mind.*

Q. Get what done?

A. The DNA test, the first one.

Q. When was the last time you saw the child?

A. *The last date, I believe, I saw this child was the day I got back my DNA paper, which was February—I had it taken on February 9th,* so three weeks from there towards the end of February I had got the results back. And that was the last day I've seen her.

T.T., 1/11/05, at 15–16 (emphasis added).

¶ 12 It appears from this testimony that appellant was influenced by the support burden and the comments of people around him, including his fiancée, to get a DNA test because of the support he was paying and "to get this done (DNA test), you know, just for peace of mind." No where in the transcript is there any allegation of fraud or belief held by either the mother or appellant that this was not a child born out of their relationship, as was clearly explicated in the findings of the trial judge.

¶ 13 In her Supplemental Opinion, filed after she received appellant's statement of matters complained of pursuant to Pa. R.A.P. 1925(b), the court writes:

Nevertheless, for the first time, Mr. Gatti, in his Statement of Matters Complained of on Appeal, raises an issue of fraud or misrepresentation by Kelly N. Gebler (hereinafter "Mother").[6] Specifically, Mr. Gatti avers that this Court erred in its application of the paternity by estoppel doctrine because, pursuant to his allegations, mother induced him into believing that he was the child's biological father and, therefore, he is not estopped from denying paternity of the child because he ceased to have contact with the child once the fraud was revealed.

This Court recognizes that evidence of fraud is relevant to the Court's equitable estoppel analysis. Specifically, a putative father will not be estopped from denying paternity of a child when fraudulent conduct induces that putative father into treating the child as his own. *J.C. v. J.S.,* 826 A.2d 1 (Pa.Super.2003); *Doran v. Doran,* 820 A.2d 1279 (Pa.Super.2003). However, there were neither allegations of mother's fraudulent activity nor evidence of fraud or misrepresentation in this case. Specifically, Mr. Gatti failed to present any evidence to indicate that mother made a misrepresentation or a fraudulent utterance inducing Mr. Gatti to act as the child's father. To the contrary, the credible testimony of mother reveals that she, like Mr. Gatti, believed that Mr. Gatti was the child's father. *See* Transcript of Proceedings Motion for Hearing, January 11, 1005[sic], at 5. Moreover, mother's testimony at the Support De Novo Hearing that she "would also like to have a DNA test done so I do know," further indicates that she was unaware that Mr. Gatti was not the child's biolog-

---

6. A party cannot rectify the failure to preserve an issue by proffering it in response to a Rule 1925(b) Order. *Commonwealth v. Kohan,* 825 A.2d 702 (Pa.Super.2003).

ical father. *See* Transcript of Proceedings De Novo Support Hearing, August 12, 2004, at 3. Accordingly, this Court did not find any fraudulent conduct on the part of mother sufficient to warrant preclusion of the doctrine of paternity by estoppel.

Trial Court Opinion at 1–2.

¶ 14 Finally, as enacted in Pennsylvania, the Uniform Act on Blood Tests to Determine Paternity gives courts authority to order blood tests only where paternity, parentage or identity of a child is a relevant fact. Blood tests to determine paternity, 23 Pa.C.S. § 5104(c).

¶ 15 Courts have deemed that paternity is not a relevant factor when the father has voluntarily and in writing acknowledged paternity and entered into an agreed support Order for the child, *Wachter v. Ascero*, 379 Pa.Super. 618, 550 A.2d 1019 (1988), or when mother has sought and received prior custody and support Orders which determined paternity as a matter of law, *Commonwealth ex rel. Coburn v. Coburn*, 384 Pa.Super. 295, 558 A.2d 548 (1989).

¶ 16 For the above reasons, I would affirm the Order of the trial court.