**B.K.B., Appellant**

v.

**J.G.K.**

v.

**M.M.K., Appellees.**

Superior Court of Pennsylvania.

Submitted May 5, 2008.
Filed July 23, 2008.

Thomas K. Hooper, Duncansville and Jennifer B. Dale, Huntingdon, for appellant.

Steven P. Passarello, Altoona and Kimberly M. Kubista, Clearfield, for appellee.

BEFORE: LALLY–GREEN, KLEIN, and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant B.K.B.[1] appeals the order denying his petition to intervene on grounds that the trial court erred in doing so based upon the doctrine of paternity by estoppel; that the trial court abused its discretion in refusing to hear DNA evidence to establish Appellant as the biological father of K.J.K., the minor-child; and that the trial court erred in failing to acknowledge that Appellee M.M.K.[2] engaged in fraud or misrepresentation regarding the parentage of K.J.K. (d.o.b. 5/4/97). We affirm.

¶ 2 The pertinent facts and procedural history of this case are as follows:

On October 14, 1999, [Appellee J.G.K.] filed a petition seeking primary custody of [K.J.K. and Z.G.K., the latter of whom is not at issue in this case either as to parentage or custody], and following a hearing, by order entered on July 22, 2002, the trial court granted primary custody of [K.J.K.] to [Appellee M.M.K.]. On September 2, 2005, [Appellee J.G.K.] filed a petition for modification of the custody order. In his petition, [Appellee J.G.K.] alleged he should have primary custody of [K.J.K.] because, *inter alia,* [Appellee M.M.K.'s] second marriage was failing [n.2] and [Appellee M.M.K.] was having an active relationship with [Appellant], whom [Appellee M.M.K.] alleged was K.J.K.'s biological father. [Appellee M.M.K.] filed an answer to the petition, and on October 27, 2005, the trial court held a custody hearing. During the hearing, [Appellee M.M.K.] testified that she had a romantic relationship with [Appellant] in the past, she is still "close friends" with [Appellant,] and he sometimes stays overnight at her house. N.T. 10/27/05 at 97–99. [Appellee M.M.K.] indicated that K.J.K. has asked [her] whether [Appellant] is his biological father and [she] has told [Appellee J.G.K.] that she wants to tell K.J.K. the truth. [n.3.] N.T. 10/27/05 at 100. [Appellee M.M.K.] testified [Appellee J.G.K.] does not want [K.J.K.] to spend time with [Appellant]. N.T. 10/27/05 at 99, 107.

At the conclusion of the hearing, the trial court directed the parties to file briefs and indicated it would rule on [Appellee J.G.K.'s] petition for modification after review thereof. The trial court indicated that it found "appalling" [Appellee M.M.K.'s] threat to tell K.J.K. that his biological father is [Appellant] and stated "I would hope that never ever leaves this courtroom." N.T. 10/27/05 at 260.

Prior to the trial court ruling on the custody matter, on November 16, 2005, [Appellant] filed a petition to intervene

---

1. Due to the sensitive nature of this case, we have substituted the parties' initials in place of their names.

2. There are two named defendants in this case: Appellee J.G.K., (who alleges to be K.J.K.'s biological father) and Appellee M.M.K. (who no one disputes is K.J.K.'s biological mother).

in the custody matter. Specifically, [Appellant] alleged that DNA testing has revealed that he is K.J.K.'s biological father and [Appellee M.M.K.] and [Appellee J.G.K.'s] marriage is no longer intact. Therefore, [Appellant] sought partial custody of K.J.K. Thereafter, without ruling on [Appellant's] petition to intervene, the trial court entered an order on November 18, 2005, granting primary physical custody of the children to [Appellee J.G.K.]. In its order, the trial court specifically indicated, *inter alia*, "[Appellee M.M.K.] shall not permit the child [K.J.K.] to be in the presence of [Appellant] at any time during her periods of partial custody." Trial Court Order filed 11/18/05 at 4.

The trial court scheduled a hearing to be held on December 19, 2005, regarding [Appellant's] petition to intervene; however, on December 13, 2005, [Appellee M.M.K.] filed a notice of appeal to [the Pennsylvania Superior Court] from the trial court's November 18, 2005 order. On December 20, 2005, [Appellee J.G.K.] filed a motion to dismiss [Appellant's] petition to intervene. Thereafter, the trial court filed an order indicating that it no longer had jurisdiction and was deferring decision on [Appellant's] petition to intervene and [Appellee J.G.K.'s] motion to dismiss since [Appellee M.M.K.] had filed an appeal to th[e Pennsylvania Superior Court]. [n.4.]

---

[n.2] [Appellee M.M.K.] and [Appellee J.G.K.] are divorced.

[n.3] [Appellee M.M.K.] has alleged in her appellate brief that DNA testing has confirmed that [Appellant] is K.J.K.'s biological father.

[n.4] [...] The trial court [...] concluded, based on the evidence presented at the custody hearing, [Appellee J.G.K.] was K.J.K.'s biological father. Trial

Court Opinion filed 5/30/06 at 4. We note that [Appellant] did not testify at the October 27, 2005 custody hearing and evidence concerning the DNA testing was not introduced into evidence.

*K[.] v. K[.]*, 2143 WDA 2005, at 1–3, 909 A.2d 896 (unpublished memorandum).

¶ 3 On appeal, this Court held that the trial court's November 18, 2005, order granting primary physical custody of K.J.K. to Appellee J.G.K., which Appellee M.M.K. appealed was neither a final nor a collateral order. This Court so held because Appellant filed a petition to intervene and Appellee J.G.K. filed a motion to dismiss the same, which rendered this Court without jurisdiction to entertain the trial court's November 18th order. This resulted in the appeal being quashed and the case being remanded for further proceedings. *K[.]*, *supra* at 5.

¶ 4 Upon remand, Appellee J.G.K. filed an amended answer and new matter to Appellant's petition to intervene raising the doctrine of paternity by estoppel. The trial court held a hearing and directed all parties to file letter briefs on the issues of presumption of paternity, paternity by estoppel, and fraud. Thereafter, with the trial court's denial of the petition to intervene, a notice of appeal was filed. Appellant submitted a Pa.R.A.P.1925(b) statement of the errors complained of on appeal. In this appeal, he first claims the trial court erred in denying the petition to intervene on the basis of paternity by estoppel because Appellant was not denying parentage. More specifically, Appellant argues:

> Estoppel is not appropriate in th[is] case [because] he is seeking to legitimize a parental role he has held since [K.J.K.'s] birth.

The record is clear that [Appellant] was doing what he believed was best for [K.J.K.] He had consistent and meaning-

ful contact with [K.J.K.] and supported him both financially and emotionally. There was never a time when [Appellant] denied he was the father. In fact, for the first eight years of [K.J.K.'s] life [Appellant] did everything he could to spend time with [K.J.K.] and [Appellee M.M.K.] never denied him the opportunity. Paternity by estoppel is not applicable to the case at hand since neither [Appellee J.G.K.] nor [Appellee M.M.K.] are denying K.J.K[.]'s parentage.

Appellant's brief, at 15. We disagree. Albeit the natural mother may endorse Appellant's status as the biological father of K.J.K., the same is not true of Appellee J.G.K. *See* Appellee's brief, at 5 ("Here, there are two (2) parties claiming to be the father of [K.J.K.]").

■ ¶ 5 In *Brinkley v. King*, 549 Pa. 241, 701 A.2d 176 (1997) (plurality opinion), the Pennsylvania Supreme Court set forth the analysis required to determine the paternity of a child conceived or born during a marriage, which is the case here; to-wit:

> Th[e ...] essential legal analysis in these cases is twofold: first, one considers whether the presumption of paternity applies to a particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity. If the presumption has been rebutted or does not apply, and if the facts of the case include estoppel evidence, such evidence must be considered. If the trier of fact finds that one or both of the parties are estopped, no blood tests will be ordered.

*Id.*, at 250, 701 A.2d at 180.

■ ¶ 6 Initially, in light of *Brinkley,* we must determine whether the presumption of paternity applies. The policy underlying the presumption of paternity is the preservation of marriages. The presumption applies in cases where that policy would be advanced by its application; otherwise, it does not apply. *Id.*, at 250–51, 701 A.2d at 181; *see also Fish v. Behers*, 559 Pa. 523, 528, 741 A.2d 721, 723 (1999). In the case at bar, there is no longer an intact family or a marriage to preserve. Appellees have been divorced since 2000. N.T. Evidentiary Hearing, 7/13/07, at 82, 112. Accordingly, the presumption of paternity is not applicable here. *See Fish, supra; Wieland v. Wieland*, 948 A.2d 863, 868 (Pa.Super.2008).

■ ¶ 7 Having concluded that the presumption does not apply, we turn to a determination of whether Appellant is estopped from questioning Appellee J.G.K.'s paternity of K.J.K., a child born during his marriage to Appellee M.M.K. and held out to be the child of the marriage. *See, e.g., John M. v. Paula T.*, 524 Pa. 306, 319–20, 571 A.2d 1380, 1387 (1990). In *Freedman v. McCandless*, 539 Pa. 584, 591–92, 654 A.2d 529, 532–33 (1995), our Supreme Court stated that estoppel in paternity actions is merely the legal determination that because of a person's conduct (*e.g.*, holding out the child as his own or supporting the child), that person, regardless of his true biological status, will not be permitted to deny parentage nor will the child's mother who participated in such conduct be permitted to sue a third party for support by claiming that the third party is the true father. The doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child." *Fish*, at 528, 741 A.2d at 723.

¶ 8 In *Jones v. Trojak*, 535 Pa. 95, 105–06, 634 A.2d 201, 206 (1993), the issue of estoppel was discussed in the context of a mother seeking child support from a third party, not her husband, whom she claimed was the father of the child. Under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child. *John M.*, at 318, 571 A.2d at 1386. These estoppel cases stand for the proposition that where the principle is operative, blood tests may be irrelevant, for the law will not permit a person in these situations to challenge the status that he or she has previously accepted. *Id.*, at 318, 571 A.2d at 1386. However, the doctrine of estoppel will not apply when evidence establishes that the father failed to accept the child as his own either by holding the child out or supporting the child. *See T.L.F. v. D.W.T.*, 796 A.2d 358, 363 (Pa.Super.2002) ("Here, there is no evidence that D.F. [husband of Appellee] has acted as E.F.'s father or that Appellee [mother of E.F.] has treated D.F. as the father. As such, we conclude that the trial court correctly determined that Appellee is not estopped from seeking child support from Appellant[, with whom Appellee had extramarital sexual intercourse while continuing to reside with husband.]").

¶ 9 Herein, Appellee M.M.K. continually assured her then husband, Appellee J.G.K., that he was K.J.K.'s father; she named him as the father on K.J.K.'s birth certificate, he was present at K.J.K.'s birth, K.J.K. bears Appellee J.G.K.'s last name, K.J.K. was covered under Appellee J.G.K.'s medical insurance policy, and K.J.K. was otherwise treated as a child of the marriage, which remained intact until "around 1998" when Appellees separated. N.T. Evidentiary Hearing, 7/13/07, at 111. In fact, although the parties divorced in 2000, Appellee J.G.K. was not approached about the paternity of K.J.K. until the second custody hearing in 2005, wherein Appellee M.M.K. first raised the question concerning Appellant being K.J.K.'s biological father. *Id.*, at 121, 123.

¶ 10 Aside from Appellant and Appellee J.G.K.'s mother alluding at trial that Appellant might be the father, we believe that K.J.K. continues to view Appellee J.G.K. as his father, and Appellee J.G.K., during K.J.K.'s first nine years of life, formed a father-son relationship with K.J.K. Even following divorce from Appellee M.M.K. in 2000, Appellee J.G.K. continued to treat both of her children equally, and he held K.J.K. out to the community as being born of his marriage. *See* N.T. Evidentiary Hearing, 7/13/07, at 41 (Appellant testified that Appellee J.G.K. "has always held this child, K[.J.K.], out as his son [ . . . ].").

¶ 11 The evidence amply shows that Appellee M.M.K. accepted Appellee J.G.K. as K.J.K.'s father and does not indicate that he failed at any time during the marriage, after the separation, or following the divorce to accept K.J.K. as his child. The father-son relationship has endured for nine years without interruption, and it is the only relationship K.J.K. has known with Appellee J.G.K. The alternative—forcing K.J.K. into a parenting relationship with Appellant, a man whom he has known as merely a "friend"—is not in K.J.K.'s best interest. As our Supreme Court stated in *Brinkley*, "Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father." *Id.*, at 249–50, 701 A.2d at 180; *see* N.T. Evidentiary Hearing, 7/13/07, at 56 (Appellant testified that the minor child "only knows his father

to be [Appellee] J.G.K. That's the only person he's been told [ . . . ]."); at 96 (Appellee M.M.K. testified that Appellee J.G.K. held himself out in the community as the father of her two sons, one of whom is K.J.K.).[3]

¶ 12 We hold that Appellant, due to his inaction for a period of nine years encompassing the birth of K.J.K. until his petition to intervene, is estopped from asserting that Appellee J.G.K. is not the biological parent of K.J.K. *See Buccieri v. Campagna,* 889 A.2d 1220, 1227 (Pa.Super.2005) ("On this record, Appellee's own delay and inactivity for eight years now bars him from confirming or asserting his paternity through genetic tests. When balanced against societal concerns for constancy in the child's life, we see no reason to allow Appellee to march into G.B.'s life at this late date. [ . . . ] Under the circumstances of this case, Appellee is estopped by his own past conduct from obtaining genetic tests to establish his paternity and/or assert his parental rights." (citation omitted)); *B.S. v. T.M.,* 782 A.2d 1031, 1036 (Pa.Super.2001) ("T.M. assumed the responsibilities he believed were his as J.'s father until he was no longer permitted to do so. At that point, he took immediate steps to assert his rights in court. Based on the above, we find the trial court did not err when it refused to apply the presumption of paternity."). Thus, given the particular facts herein, we find the doctrine of estoppel applies. *Fish,* at 529, 741 A.2d at 724.

¶ 13 We next examine Appellant's contention that the trial court erred in refusing to hear DNA evidence establishing him as the biological father of K.J.K.

¶ 14 The fact that we have concluded that the doctrine of estoppel applies to deny Appellant's petition to intervene renders irrelevant the results of Appellant's DNA test. *See John M.,* at 318, 571 A.2d at 1388 ("It is recognized that, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child. [ . . . ] Where the principle [of estoppel] is operative, blood tests may well be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted." (*citing Freedman,* at 591–92 n. 5, 654 A.2d at 533 n. 5.)).

¶ 15 *Sub judice,* despite the fact that Appellant was present when Appellee M.M.K. took a pregnancy test and announced the child was his, Appellant chose to play a secondary role in K.J.K.'s life as his "friend." N.T. Evidentiary Hearing, 7/13/07, at 12 (Appellee M.M.K. told Appellant that the child was his, "As soon as the pregnancy test was taken."); at 54 (Appellant testified that Appellee M.M.K. referred to him not as a second father but as "a family friend."); at 76 (Appellee M.M.K. told Appellant "that he was the father[.]"); at 93 (Appellee M.M.K. stated that her children referred to Appellant as "B[ ] Daddy[,]" but they also referred to

---

**3.** In addition to Appellee J.G.K. being listed on school records as the boy's father, he was his little league baseball coach, and interacted in other aspects of his life; to-wit:

[Attorney for Appellee J.G.K.:]
Q. He's always acted as K[.J.K.]'s father?
[Appellee M.M.K.:]
A. Yes. He's been there.
Q. He was at the hospital for his birth?
A. Yes.
Q. He was at church ceremonies so the child could be taken into the church?
A. Yes.
Q. Recognized as the boy's father on both of those occasions. Right?
A. Yes.
N.T. Evidentiary Hearing, 7/13/07, at 96–97.

him as "a friend."). Appellant also tries to justify his subservient role over the last nine years, during which period two custody hearings were conducted in 2002 and 2005 and he failed to raise the parentage issue as a by-product of appeasing Appellee M.M.K., who was allowing him to see "the boys consistently" and to allay her fears that her two boys would be separated or would not have the same last name if DNA testing were performed. *Id.*, at 15–17, 21, 24, 26, 28, 37, 86–87. As a result, Appellant "followed her lead[,]" and let the Appellee M.M.K. make the decisions regarding when the parentage issue would surface. *Id.* at 58, 61 (Appellant did not act because, "[Appellee M.M.K.] would not support [him] in the decision to get a DNA test to pursue [the custody issue].").[4]

¶ 16 Consistent with the unique circumstances recounted above, we hold that Appellant is estopped by his own past conduct from submitting into evidence the results of DNA testing to establish his paternity and/or assert his paternal rights. *Buccieri,* 889 A.2d at 1227.

■ ¶ 17 Finally, we assess the merits of Appellant's argument that he should be able to overcome estoppel because Appellee M.M.K. benefited by misleading both Appellee J.G.K. and Appellant, and therefore, her fraud should preclude any application of paternity by estoppel. *See* Appellant's brief, at 18.

■ ¶ 18 We begin by acknowledging that when fraud is inserted into a case, the whole tone and tenor of a case is altered. Further, when such an assertion is made it opens the door to overturning settled issues and policies of the law. *See Gebler v. Gatti,* 895 A.2d 1, 4 (Pa.Su-

per.2006). Even where the father-child relationship has been established, as is the case here, evidence of fraud may preclude application of the doctrine of paternity by estoppel. *Id.* 895 A.2d at 4. The test for fraud is: (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. *B.O. v. C.O.,* 404 Pa.Super. 127, 590 A.2d 313, 315 (1991).

¶ 19 The trial court responded to Appellant's fraud argument thusly:

[Appellant] alleges that he is the victim of [Appellee M.M.K.'s] fraudulent conduct. Specifically, that she allowed both [Appellee J.G.K.] and [Appellant] to believe that they were K[.J.K.]'s father while receiving financial assistance from both of them. "When allegations of fraud arise in a paternity action, an estoppel analysis must proceed in a different manner than it would without such averments. Evidence of fraud must be considered by the trial court in whether to apply paternity by estoppel." *Doran v. Doran,* 820 A.2d 1279, 1283 (Pa.Super.2003) (citations omitted). [The trial court went on to set forth the test for fraud articulated by the Superior Court in *Doran, supra,* which is identical to the one recited above in *B.O., supra,* before applying the facts to the law; to-wit:]

Here, [Appellant] does not show that [Appellee M.M.K.] made any misrepresentations or made a fraudulent utterance to him concerning K[.J.K.] He knew that [Appellee M.M.K.] was married to [Appellee J.G.K.] when he en-

---

4. It would appear that Appellant attempts to deflect responsibility for his inaction regarding custody. For example, in response to the trial court questioning whether Appellant blamed a lawyer for his nine years of inactivity, Appellant answered, "Primarily, yes." N.T. Evidentiary Hearing, 7/13/07, at 67; *see also id.,* at 23–24 (same).

gaged in an extramarital affair with her. He was necessarily aware of the fact that [Appellee J.G.K.] believed K[.J.K.] to be his own son because he went to the first custody hearing between [Appellees]. [Appellant] alleges that he knew about his alleged paternity since K[.J.K.] was conceived—there was no misrepresentation made by [Appellee M.M.K.] to [Appellant], rather her misrepresentation was made to [Appellee J.G.K.]. As [Appellant] was not the victim of [Appellee M.M.K.'s] fraud, he cannot now claim it to interfere with the relationship that both he and [Appellee M.M.K.] allowed to flourish between K[.J.K.] and [Appellee J.G.K.] for the past nine years.

Trial court opinion, 10/4/07, at 4–5 (unnumbered). We agree.

¶ 20 It is clear from our review of the record that Appellee M.M.K.'s concealment was intended to deceive Appellee J.G.K. and not Appellant. *See Gebler,* 895 A.2d at 5 ("rejecting fraud argument where no evidence of record was cited to support conclusion that mother fraudulently caused [A]ppellant to acknowledge paternity.") (quoting *Hamilton v. Hamilton,* 795 A.2d 403 (Pa.Super.2002)). Ergo, application of the paternity by estoppel doctrine is germane in this case to undermine Appellant's fraud argument. Appellant sat back for nine years and allowed Appellee J.G.K. and K.J.K. to believe that Appellee J.G.K. was the biological father of K.J.K., which was perpetuated despite Appellant being informed by Appellee M.M.K. that

he (Appellant) was the biological father. *Contrast Vargo v. Schwartz,* 940 A.2d 459 (Pa.Super.2007) (doctrine of paternity by estoppel inapplicable because of fraud perpetrated by Appellee (mother/Vargo) and Appellant (biological father/Schwartz/paramour) upon Mr. Vargo (presumptive father), who publicly disavowed paternity of Appellee's girls once told he was not biological father; Mr. Vargo's continuing support of girls after learning he was not biological father was the product of trying to do right thing until Appellant was held liable for support; therefore, paternity by estoppel was not applicable to punish Mr. Vargo by burdening him with obligation to support children, while rewarding Appellant (by relieving him of support obligation) despite perpetrating fraud); *Gebler, supra* (putative father lulled into believing he was father by fraud committed by mother; putative father not estopped from denying paternity when fraud induced him into treating the child as his own).

¶ 21 Whether a court invokes paternity by estoppel can turn on small details of fact specific to a given set of circumstances. At bar, unlike in *Vargo* and *Gebler*,[5] Appellee M.M.K. told Appellant immediately when she was pregnant and that Appellant was the father instead of her husband, Appellee J.G.K. Thus, in the absence of any evidence of fraud engaged in by Appellee M.M.K. against Appellant, we hold Appellant is estopped from using

---

**5.** The present case can also be distinguished from *R.W.E. v. A.B.K. and M.K.,* 35 EDA 2007 (J. E03001/08). The trial court in *R.W.E.* found that the mother committed fraud against the biological father by not informing him of his parental status. Once the biological father learned that he was a parent, he took immediate legal action to establish his parental rights. The fraud finding is an issue challenged on appeal. However, in the present case, the trial court found, and we agreed,

that the mother did not commit a fraud against Appellant. Further, Appellant claimed that he knew he was the biological father of K.J.K. immediately upon Appellee M.M.K. taking a pregnancy test, but he did not take legal action to establish his parental rights to K.J.K. for nine years. Because of these two distinguishable findings, we see no need to hold this decision for the *en banc* decision in *R.W.E.*

fraud to discount the applicability of the doctrine of estoppel or circumvent his legal passivity for nine years regarding K.J.K.

¶ 22 Accordingly, finding no merit to any of the claims raised, we affirm the order appealed.

¶ 23 Order affirmed.

¶ 24 LALLY–GREEN, J., files a Concurring Statement.

CONCURRING STATEMENT BY LALLY–GREEN, J.:

¶ 1 I join in the majority's well-reasoned opinion. I write separately only to encourage our General Assembly to consider whether a statutory scheme addressing the issues before us would serve the public better than a slowly evolving body of jurisprudence.